413 So.2d 1372 (1982)
Harvey YORK
v.
STATE of Mississippi.
No. 53048.
Supreme Court of Mississippi.
May 12, 1982.
Bentley E. Conner, Canton, for appellant.
Bill Allain, Atty. Gen., by Wayne Snuggs, Asst. Atty. Gen., Jackson, for appellee.
Before SMITH, ROY NOBLE LEE and HAWKINS, JJ.
HAWKINS, Justice, for the Court.
Harvey York appeals from a conviction of armed robbery and a twenty-five year sentence in the circuit court of Madison County.
*1373 The only issue we address on this appeal is whether the trial court erred in overruling York's motion to suppress the evidence relating to his identification following a prior pretrial lineup identification. This in turn involves questions of Sixth Amendment rights (right to counsel at the lineup), Fourteenth Amendment rights (due process of law), and whether or not the State proved identity beyond every reasonable doubt. We affirm.
Decisions of the United States Supreme Court beginning in 1967 have precipitated a flood of alleged constitutional violations throughout the United States of defendants' rights in criminal cases, in which our state courts have had their share. There has been confusion of the meaning of these cases, especially in defining the boundaries of their application. This case is a vehicle for review of the history of the U.S. Supreme Court cases concerning identifications and their present application to our Court, ever bearing in mind, however, that the application of the principles of these decisions, like the tide, expand and contract.

FACTS
Mrs. Rosa Lee Tharp was working in the Handee Mart in Ridgeland on July 23, 1980, and was robbed at approximately nine o'clock that night. She was the only witness who testified to the details of the robbery, although there were two others who witnessed at least a part of the crime.
According to Mrs. Tharp, the robber entered the store, picked up a soft drink in the back, and asked her where the potato chip rack was. As he set the items on the counter for Mrs. Tharp to ring up, he pulled out a pistol and told her not to try anything and that he wanted the money from the cash register. He then went around the counter, where Mrs. Tharp was on her knees in fear, and helped himself to the contents of the cash register.
As the robber was leaving, two youths, Steve Rivers and Ken Whatley, were entering.[1] The robber asked Rivers what kind of car he had, and Rivers replied, "Mustang," whereupon the robber told the boy to give him the keys. Rivers responded, "You've got to be kiddin', that's a new car," and further, "I know that's a play gun you got." The robber responded by shooting into the ceiling, and Rivers immediately threw him the keys.
Three days later York was arrested, and less than a week after the robbery, was placed in a lineup conducted by the Jackson Police Department. Mrs. Tharp promptly identified York as the robber at the lineup proceeding. Rivers and Whatley were also present at the lineup, however neither of them were called by the State or defense at either the hearing on the motion to suppress or the trial.[2]
Mrs. Tharp was quite positive York was the robber. She had an opportunity to view the robber two to three minutes during the robbery and stated at the motion to suppress that she "spotted him right off" at the lineup. Her only articulated reasons for the identification, however, were that she "could never forget those eyes" (though she could not remember whether they were blue or black), and that she recognized the boots he was wearing.
The robber's height was particularly difficult for Mrs. Tharp to describe. At one point she stated that he was about five feet, but added that he "might not have been that tall." Mrs. Tharp, 5'5" herself, then stated, "I don't know much about height, but I was looking at him," thus inferring he was taller than five feet. She further described *1374 the robber as weighing 150-55 pounds with red curly hair.[3]
The identification testimony by Mrs. Tharp was essentially the same during the trial as during the motion to suppress, and she never hesitated or wavered from her instant identification at the lineup to and throughout the trial.
York is 6'1", about 185 pounds, and has brown eyes. There was conflicting testimony as to the color of York's hair at the lineup, but it was not red or curly, like the robber's hair.
On the motion to suppress the identification, York testified that he did not resemble any of the others in the lineup. Most of them were "just under my height," and one was "a lot taller than I was." He further testified, "all of 'em had on gold jump suits, city jump suits, and they let them put a white shirt on." According to York, he was not wearing a jump suit, and had on light brown slacks and a white shirt. He also testified that the others wore tennis shoes, while he wore boots. On cross-examination he testified the others "wasn't near my height," and were "lots slimmer than I was, I stuck out like a sore thumb." Further cross-examination of York revealed that there was no great difference in height between him and the others, and that he was not positive about the dress of the others.
The arresting officer Watkins, who was a witness at the lineup, testified that all participants in the lineup ranged from 5'9" to 6'1", their clothing was similar, and all except one (not York) wore brown shoes. On cross-examination, however, Watkins was not positive about the shoes worn.
During the pretrial hearing on the motion to suppress his identification, York never denied that the identification of him by Mrs. Tharp was correct. York did not take the witness stand during the trial. Additionally, on this appeal the conviction is not challenged because it might be against the overwhelming weight of the evidence.

HISTORY OF TRIAL COURT PROBLEMS WITH IDENTIFICATION
Prior to 1967, this Court had no competency test for the admissibility of testimony identifying the accused as the perpetrator of the crime. We did say that proof of identity, as any other element of the crime, had to be proved beyond a reasonable doubt. The weight and credibility of any identification, however, were left solely to the jury. Passons v. State, 239 Miss. 629, 124 So.2d 847 (1960).
In February, 1967, the United States Supreme Court in three decisions initiated an indepth search of the inherent problems with accuracy of identification testimony. It is a haunting question. When a false identification results in a conviction, two unfortunate developments follow: an innocent person is convicted, and a criminal remains loose in society.
These three decisions, called by commentators the "Wade trilogy," are: United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).
These cases and their progeny are the present guidelines this Court must follow in determining the competency of identification testimony, whenever this issue is called into question.
In United States v. Wade, the accused, being represented by counsel, was required to participate in a lineup in a courtroom after his indictment, without his attorney present. Wade and five or six other prisoners were required to put tape on their faces and were exhibited to eyewitnesses to a bank robbery. Each participant, including Wade, was required to state, "Put the money in the bag," the words of the robber spoken during the commission of the crime. During the trial of his case, the witnesses simply identified Wade in the courtroom on *1375 direct examination, however, the prior lineup identification was later elicited on cross.
Upon conviction, Wade argued on appeal to the Fifth Circuit Court of Appeals that the lineup proceeding, having been conducted in the absence of and without the knowledge of his attorney, had violated his Sixth Amendment right to counsel. In agreement with this argument, the Fifth Circuit reversed and remanded for a new trial in which the in-court identification evidence was to be excluded.
The United States Court's opinion analyzed in considerable depth the problem of accurate identification and the fallibility of human perception:
But the confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.
388 U.S. at 228, 87 S.Ct. at 1933. A great number of faulty and misleading methods of identification were noted.
As stated, during the trial the eyewitnesses made no reference to having previously identified Wade in the pretrial lineup until cross-examined. The Supreme Court then observed the burden this placed upon the defense counsel:
... The State may then rest upon the witnesses' unequivocal courtroom identification, and not mention the pretrial identification as part of the State's case at trial. Counsel is then in the predicament in which Wade's counsel found himself  realizing that possible unfairness at the lineup may be the sole means of attack upon the unequivocal courtroom identification, and having to probe in the dark in an attempt to discover and reveal unfairness, while bolstering the government witness' courtroom identification by bringing out and dwelling upon his prior identification.
Id. at 240-41, 87 S.Ct. at 1939.
Holding that Wade was entitled to presence of counsel at the pretrial lineup, the Supreme Court vacated the Fifth Circuit judgment and remanded "to determine whether the in-court identification had an independent source, or whether, in any event, the introduction of the evidence was harmless error." Id. at 242, 87 S.Ct. at 1940.[4]
The Supreme Court listed several factors for the district court to consider on remand in determining whether or not the government had clearly and convincingly established that the in-court identification is free of the taint of impermissible pretrial lineup proceeding:
... Application of this test in the present context requires consideration of various factors; for example, the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup.
Id. at 241, 87 S.Ct. at 1940.
Wade took a gloomy view of pretrial identification methods, recognizing that many such procedures were suggestive of guilt or unduly emphasized the suspect as the perpetrator. The Court noted the pretrial identification of Wade was thusly flawed. The Court reversed, however, not because of the procedure used in the pretrial identification, but rather because *1376 Wade's attorney, who was not present, was thereby deprived of a useful tool in cross-examination, with which to expose to the court and jury the flaws in the procedure used to identify his client.
In Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), Gilbert was convicted in a bifurcated trial for the murder of a police officer during an armed robbery of a savings and loan association, and was sentenced to death. After his indictment, the police conducted a pretrial lineup identification in an auditorium without Gilbert's attorney present. More than a hundred people were in the audience, all eyewitnesses to one of several robberies charged to Gilbert.
During the guilt phase of his trial, the cashier eyewitness simply identified Gilbert as the perpetrator. The trial judge denied the defense counsel's motion to question this witness, out of the presence of the jury, to determine whether her identification was predicated mainly on the pretrial showup. The other witnesses, who also identified Gilbert during the trial, testified on cross-examination that they had previously identified him at the pretrial showup.
During the penalty phase of the trial, eight witnesses to other robberies charged to Gilbert identified him, and were also permitted, over objection, to testify that they had identified him at the pretrial showup.
For the same reasons expressed in Wade, the Court reversed the conviction and remanded for the determination by the California Supreme Court as to the proceedings necessary to "establish that the in-court identification had an independent source, or that their introduction in evidence was in any event harmless error." 388 U.S. at 272, 87 S.Ct. at 1956.[5]
The Supreme Court then held that the testimony of the witnesses during the penalty stages of their pretrial identification of Gilbert must be excluded completely, since his attorney had not been present.[6]
In Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), we have, for the first time, a case in which the accused argued his conviction should be set aside, not only because he was denied counsel at a pretrial identification (a violation of his Sixth Amendment right to counsel), but also the procedure used to identify him was so unfair that it denied him due process of law (the Fourteenth Amendment).
A physician, Dr. Behrendt, had been stabbed to death in his Long Island home. His wife had been stabbed eleven times and critically wounded. Stovall was arrested the following day, and his arraignment was postponed to give him time to retain counsel. However, without allowing him to retain counsel, the police took him handcuffed to the victim's hospital room and required him to speak. Stovall was then identified by Mrs. Behrendt.
At Stovall's trial in a New York state court, the officers and the victim testified as to the pretrial hospital room identification. Mrs. Behrendt also identified Stovall in court. Stovall's conviction and death sentence were affirmed by the New York Court of Appeals.
At a later date Stovall filed a pro se habeas corpus request from prison in a United States District Court in New York, *1377 and it eventually reached the United States Supreme Court. He claimed the identification testimony of Mrs. Behrendt violated his rights under the Fifth, Sixth and Fourteenth Amendments "because he had been compelled to submit to the hospital room confrontation without the help of counsel and under circumstances which unfairly focused the witness' attention on him as the man believed by the police to be the guilty person." Id. at 296, 87 S.Ct. at 1969.
On Stovall's claim of denial of his right to have a lawyer present at the pretrial identification, the Supreme Court declined to apply the right to counsel rule announced in Wade and Gilbert retroactively, and denied him this relief.
The Court then considered the question of whether the identification method utilized by the police was so unfair as to deny Stovall due process of law, and decided there had been no Fourteenth Amendment violation.
In this initial consideration of whether an identification procedure in and of itself violated an accused's right to due process, the Supreme Court's opinion is significant:
We turn now to the question whether petitioner, although not entitled to the application of Wade and Gilbert to his case, is entitled to relief on his claim that in any event the confrontation conducted in this case was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law. This is a recognized ground of attack upon a conviction independent of any right to counsel claim. Palmer v. Peyton, 359 F.2d 199 (CA4th Cir.1966). The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned. However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it, and the record in the present case reveals that the showing of Stovall to Mrs. Behrendt in an immediate hospital confrontation was imperative. The Court of Appeals, en banc, stated, 355 F.2d [731] at 735, "Here was the only person in the world who could possibly exonerate Stovall. Her words, and only her words, `He is not the man' could have resulted in freedom for Stovall. The hospital was not far distant from the courthouse and jail. No one knew how long Mrs. Behrendt might live. Faced with the responsibility of identifying the attacker, with the need for immediate action and with the knowledge that Mrs. Behrendt could not visit the jail, the police followed the only feasible procedure and took Stovall to the hospital room. Under these circumstances, the usual police station line-up, which Stovall now argues he should have had, was out of the question."
Id. at 301-02, 87 S.Ct. at 1972-73.
It is important to note the Court, in determining whether or not the pretrial confrontation denied an accused due process of law, used the now familiar clause, that it "depends on the totality of the circumstances surrounding it... ."
Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), was the first United States Supreme Court case following the Wade trilogy. Simmons and two others were convicted in an Illinois United States District Court for bank robbery. Five bank employees identified Simmons from snapshots given the police by a sister of a co-defendant. Eyewitnesses were also shown an indeterminate number of photographs of different persons, from which Simmons was identified. No photographs were introduced at trial; all witnesses simply identified Simmons in the courtroom.
On appeal Simmons asserted that "his pretrial identification by means of photographs was in the circumstances so unnecessarily suggestive and conducive to misidentification as to deny him due process of law, ... ." Id. at 381, 88 S.Ct. at 970. Simmons did not argue a deprivation of a Sixth Amendment right to counsel as stated in the opinion. "Rather, he asserts simply that in the circumstances the identification procedure was so unduly prejudicial as fatally *1378 to taint his conviction. This is a claim which must be evaluated in light of the totality of surrounding circumstances." Id. at 383, 88 S.Ct. at 970.
Again, it is significant to quote precisely what the United States Supreme Court states in its opinion:
It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.
Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. This standard accords with our resolution of a similar issue in Stovall v. Denno, 388 U.S. 293, 301-302, 87 S.Ct. 1967 [1972-73], 18 L.Ed.2d 1199, 1206, and with decisions of other courts on the question of identification by photograph.
Id. at 383-84, 88 S.Ct. at 971.
In Simmons, the Court uses the now familiar clause that no conviction based on pretrial identification will be set aside because of a due process of law violation unless "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."
In Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), Foster was convicted in a California state court of armed robbery of a Western Union office. The United States Supreme Court granted certiorari from an affirmance of his conviction on the sole question of whether the police lineup violated his constitutional rights. David, the night manager of the Western Union office, witnessed the robbery. The police conducted a lineup of three men, including Foster. Foster was at least six inches taller than the other two men in the lineup and the only person wearing a leather jacket. David said the jacket was similar to the one the robber wore, which had been visible underneath the robber's coveralls. David "thought" Foster was the man, but was not sure. At David's request Foster was brought into an office, sat across a table from David, and was required to speak. Police officers were the only other persons present in the room. *1379 David was still uncertain: "Truthfully  I was not sure," he testified.
A week or ten days later there was a second lineup of five men, with Foster being the only participant who had been in the first lineup. This time David was "convinced" Foster was the man.
At the trial David testified to his identification in the pretrial lineups and also made an in-court identification. The only other evidence against Foster was testimony from an accomplice who had turned state's witness and evidence of conviction of a previous robbery.[7]
As in Stovall, the Court did not consider the question of whether these lineups violated Foster's Sixth Amendment right to counsel at the lineup, since the trial preceded Wade, but did consider violation of Foster's due process rights. Judge by the "totality of the circumstances", was the conduct of the pretrial identification procedures "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to be a denial of due process of law?[8]
The Court held this case constituted a compelling example of unfair identification procedures. The Court stated:
The suggestive elements in this identification procedure made it all but inevitable that David would identify petitioner whether or not he was in fact "the man." In effect, the police repeatedly said to the witness, "This is the man." ... This procedure so undermined the reliability of the eyewitness identification as to violate due process.
Id. at 443, 89 S.Ct. at 1129.
The case was reversed for further proceedings in the state court "not inconsistent with this opinion."[9]
In Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), there was an in-court identification, but no testimony was offered of the out-of-court identification.
At 11:30 p.m. the victim, Reynolds, was changing a flat tire when three men approached from across the highway. One of the men shot Reynolds from a short distance away. Reynolds raised himself up and held on to his wife. One man (later identified as Coleman) put his hand on Mrs. Reynolds' shoulder. Within a few seconds a car with lights approached, and the three turned and ran across the road. As they turned to go, Reynolds was shot a second time.
Reynolds identified the defendant Stephens as the gunman, stating he saw him in the car lights while looking straight at him. As to Coleman, he testified he saw him face to face, stating, "I looked into his face ... [and] got a real good look at him." At the hearing on a pretrial motion to suppress identification evidence, it was shown that Reynolds had been unable to give anything more than a vague description in his hospital *1380 room, nothing to specifically identify either suspect; nor was Reynolds able to identify either suspect from mug shots shown him.
At the lineup, however, Reynolds spontaneously identified Stephens before the formal lineup began, recognizing him as soon as he saw him. He also identified Coleman in the lineup, according to Reynolds, before Coleman had spoken any words.
There was conflicting testimony on whether Coleman and Stephens were the only ones required to speak, and Coleman testified he was the only one required to wear a hat. However, the Supreme Court said the hat did not identify Coleman since Reynolds asked that the hat be raised for a better look at his face.
The Supreme Court held that from the record before it, there was no error in the trial court's finding that Reynolds' in-court identification did not stem from a procedure at the lineup "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Indeed, the Court noted the trial court could have found Reynolds' identifications were entirely based upon observations at the time of the assault, not the lineup. Id. at 5-6, 90 S.Ct. at 2001-02.
The holdings of Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), have guided most of this Court's decisions on eyewitness identification testimony, and is the case most familiar to the bench and bar of this State.
During the trial the victim not only identified Biggers in the courtroom, but also gave testimony concerning a station house identification of Biggers. Biggers argued the identification method used violated due process of law.
The victim, a practical nurse, testified that on the night of January 22, 1965, a youth with a butcher knife grabbed her in her kitchen, and threw her on the floor. No light was in the kitchen, but light came through the bedroom doorway, and she testified she could see who her assailant was. The victim's twelve year old daughter heard her scream, and also began screaming. Under threat of killing them both unless they shut up, the victim was then taken two blocks along a railroad track and into a woods, and raped. The moon was full that night and shining brightly. The entire episode lasted from fifteen to thirty minutes.
She described her assailant as "being fat and flabby with smooth skin, bushy hair, and a youthful voice." She added that he was between sixteen and eighteen years, five feet ten inches to six feet tall, weighed 180-200 pounds, and had a dark brown complexion.
Over the next seven months on several occasions she viewed suspects in her home and at the police station in lineups or showups, without identifying any. Out of thirty to forty photographs, she selected one as having features similar to her assailant, but identified none of them.
On August 17 she was called to the police station to view Biggers, who was being held on another charge. A showup was conducted in which two detectives walked Biggers past her, and at her request required him to say "shut up or I'll kill you."
She identified Biggers as her assailant and testified she had "no doubt," stating, "I knew it was the individual, because his face  well, there was just something I don't think I could ever forget." Id. at 195-96, 93 S.Ct. at 380.
Biggers reiterated Stovall in that the defendant could claim "the confrontation conducted was so unnecessarily suggestive and conducive to mistaken identification that he was denied due process of law." This in turn must be determined "on the totality of the circumstances." 409 U.S. at 196, 93 S.Ct. at 380.
After reviewing the cases we have examined in this opinion, the Supreme Court stated:
Some general guidelines emerge from these cases as to the relationship between suggestiveness and misidentification. It is, first of all, apparent that the primary evil to be avoided is "a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S., at 384, 88 S.Ct., 967 [at 971], 19 *1381 L.Ed.2d 1247. While the phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of "irreparable" it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself. It is the likelihood of misidentification which violates a defendant's right to due process, and it is this which was the basis of the exclusion of evidence in Foster. Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous. But as Stovall makes clear, the admission of evidence of a showup without more does not violate due process.
Id. at 198, 93 S.Ct. at 381-82.
From the above passage it can be seen that Biggers recognized the identification problem could come about in two different evidentiary situations: (1) an in-court identification based upon a suggestive pretrial identification procedure, and (2) testimony pertaining to the out-of-court suggestive identification proceeding itself. In this case there was both an in-court identification and also testimony pertaining to the out-of-court identification.
The Court said an in-court identification could be made despite suggestive pretrial identification unless the pretrial procedure created "a very substantial likelihood of irreparable misidentification."
The Court then said that to offer testimony concerning the suggestive pretrial identification itself did not violate due process, unless the pretrial procedure created "a very substantial likelihood of misidentification."
By omitting the word "irreparable" the Court placed a slightly greater burden upon the prosecution to justify admission of evidence pertaining to a suggestive out-of-court identification, than an in-court identification by an eyewitness following a suggestive pretrial identification.
The Supreme Court held that unnecessarily suggestive pretrial identifications did not in and of themselves require exclusion of the evidence. Rather, evidence of a suggestive out-of-court identification will be admissible if, from a totality of the circumstances, the identification was reliable.
In making this determination, the Court gave the now familiar factors to be considered:
... As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.[10]
Id. at 199, 93 S.Ct. at 382.
Using these criteria the Court found the identification passed inspection. She had spent considerable time with Biggers, saw him under adequate light in her house and in the moonlight, where she faced him directly and intimately, not as a casual observer. Further, her description was more than ordinarily thorough, and she had "no doubt" Biggers was the person who raped her. Her record for reliability was good, having previously resisted suggestiveness inherent in a showup. Both her in-court and out-of-court identification testimony was proper to go to the jury.
The Supreme Court in Stovall was inclined to be lenient even though the pretrial procedure was suggestive, because it was necessary. On the other hand, in Biggers the showup was both suggestive and unnecessary, but the conviction was nevertheless permitted to stand. See Kirby v. Sturges, *1382 510 F.2d 397 (7th Cir.1975), for an excellent discussion of the problem.
Biggers was looking at a pre-Stovall factual situation, and there was some question as to whether its standard on admissibility of evidence pertaining to the pretrial identification would apply to future cases.
In Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), a Connecticut state court permitted testimony of a pretrial identification, which was admittedly both suggestive and unnecessary. The question in Manson was not the admissibility of an in-court identification, which preceeded suggestive pretrial identification procedures, but whether testimony of such pretrial identification was admissible, even though suggestive and unnecessary.
The Court held that if the identification is "reliable" under the criteria of Biggers, then the admission of evidence of an out-of-court identification does not violate due process of law, even though both unnecessary and suggestive. Thus, any possible question as to a distinction being made between pre and post Stovall fact situations had been removed. The Court concluded, stating:
We therefore conclude that reliability is the linchpin in determining the admissibility in both pre and post Stovall confrontations.
* * * * * *
Surely, we cannot say that under all the circumstances of this case there is "a very substantial likelihood of irreparable misidentification." Id. [390 U.S.] at 384, 88 S.Ct. 967 [at 971], 19 L.Ed.2d 1247. Short of that point, such evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.
Id. at 114, 116, 97 S.Ct. at 2253-54.
In both Biggers and Manson, the opinions reveal sufficient factual bases as to why the eyewitness could identify the suspects, despite the suggestive identification procedures.
The Court in Manson gave serious consideration to automatically excluding any evidence of a suggestive pretrial identification which was unnecessary under the circumstances, admittedly the situation in that case. The very strong dissenting opinion urged the adoption of such a per se exclusionary rule of such evidence, arguing the prosecution was not thereby deprived of an opportunity to identify the accused in court. The Court declined to adopt such a rule, however.
The above United States Supreme Court cases have brought a plethora of claims by defendants that their constitutional rights have been violated. Numerous cases by this Court have addressed such claims.[11] Illuminating observations made from these United States Supreme Court decisions are contained in the following decisions by this Court: Chambers v. State, 402 So.2d 344 (Miss. 1981); Miller v. State, 399 So.2d 1338 (Miss. 1981); Bankston v. State, 391 So.2d 1005 (Miss. 1980); and Scott v. State, 359 So.2d 1355 (Miss. 1978). Under our holding in the cases of Porter v. State, 339 So.2d 564 (Miss. 1976); Butler v. State, 217 So.2d 3 (Miss. 1968); Short v. State, 211 So.2d 545 *1383 (Miss. 1968); and Anderson v. State, 171 Miss. 41, 156 So. 645 (1934), testimony pertaining to an out of court or pretrial identification of the accused was inadmissible, aside from an alleged due process of law violation.
Had the evidentiary exclusionary rule of pretrial identification of these cases remained in effect, we ordinarily would not be faced with the constitutional test of Biggers and Brathwaite, because such testimony would have been inadmissible in any event. In the case of Fells v. State, 345 So.2d 618 (Miss. 1977), however, we held testimony of a pretrial identification was competent evidence.
All of our State cases in which eyewitness identification was a disputed issue therefore come under the ambit of these United States Supreme Court decisions. The rules announced therein must govern our decisions.
What synthesis may be gathered from them?

SIXTH AMENDMENT (RIGHT TO COUNSEL)
A participant in a lineup has a right to have a lawyer present only if criminal proceedings have been instituted against him. If the right is violated, the prosecution will be permitted an in-court identification by the eyewitnesses who viewed the proscribed lineup only upon a showing by clear and convincing evidence that the in-court identifications are based upon observations of the suspect other than the lineup identification. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

FOURTEENTH AMENDMENT (DUE PROCESS OF LAW)
Only pretrial identifications which are suggestive, without necessity for conducting them in such manner, are proscribed. A lineup or series of photographs in which the accused, when compared with the others, is conspicuously singled out in some manner from the others, either from appearance or statements by an officer, is impermissibly suggestive. Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). A showup in which the accused is brought by an officer to the eyewitness is likewise impermissibly suggestive where there is no necessity for doing so. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (impermissively suggestive); Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (same); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) (not impermissively suggestive).
An impermissibly suggestive pretrial identification does not preclude in-court identification by an eyewitness who viewed the suspect at the procedure, unless: (1) from the totality of the circumstances surrounding it[12] (2) the identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.[13]
Even if testimony is proffered of the out-of-court identification itself, the same standard exists as to the above, with the omission of the word "irreparable."[14]
In determining whether these standards are fulfilled, Neil v. Biggers states the following may be considered:
... the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
409 U.S. at 199, 93 S.Ct. at 382.
In the final analysis, under Manson v. Brathwaite, "reliability is the linchpin in determining the admissibility... ."
*1384 It can thus be observed that an accused who seeks to exclude identification testimony based upon an alleged due process violation faces a very heavy burden. Even though the pretrial identification is impermissibly suggestive, he must still show the conduct gave rise to a very substantial likelihood of irreparable misidentification.

* * *
In the present case there was no showing of a Sixth Amendment violation, because no adversary criminal proceeding was shown to have been instituted against York when placed in the lineup and identified. Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).
On the claimed due process violation there was no showing that the lineup proceeding had been impermissibly suggestive, certainly no more so than the lineup procedure in Coleman v. Alabama, supra, which the United States Supreme Court did not condemn.
Moreover, even if we were to hold the pretrial procedure was impermissibly suggestive, there was still no due process violation. The State fulfilled all the criteria of Biggers except "the accuracy of the witness' prior description" of York. On this one factor, no proof was offered as to any prior description she had given the officers, one way or another.
The identification testimony was competent. A jury question on this issue was clearly presented. As to its credibility, while it would have been more preferable had Mrs. Tharp articulated more reasons as her basis for identifying York, she was nevertheless positive and unequivocal in identifying him as the robber. Furthermore, no witness contradicted the accuracy of this identification. See Rush v. State, 301 So.2d 297 (Miss. 1974); Reeves v. State, 159 Miss. 498, 132 So. 331 (1931).
The conviction and sentence is therefore affirmed.
AFFIRMED.
PATTERSON, C.J., SUGG and WALKER, P. JJ., and BROOM, ROY NOBLE LEE, BOWLING, HAWKINS, DAN M. LEE and DARDEN, JJ., concur.
NOTES
[1] Whatley, who was apparently with Rivers, also had an opportunity to observe the robber. His precise location during the episode, however, is not clear from the record.
[2] Arresting officer Watkins testified at the motion to suppress that Whatley was of the opinion York was the robber, but was not positive. Whatley's opinion would have been competent, even though he was not certain. A witness does not have to be positive in his identification for his testimony to be competent before a jury. Little v. State, 357 So.2d 379, 383 (Ala.Cr.App. 1978); 23 C.J.S. Criminal Law Sections 864, 920.
[3] It should be noted that it is not clear from the record whether this was the description given to the police officers prior to the lineup.
[4] That in-court identifications are based upon observations of the suspect other than the line-up identification has to be established by the prosecution by clear and convincing evidence. As to what constitutes harmless error in the denial of a federal constitutional right, see Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
[5] In Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), the Supreme Court held the Sixth Amendment right to counsel at a lineup is limited to those cases in which an adversary judicial proceeding has been instituted against the accused. A routine lineup or showup identification of a suspect before any formal charge has been made against him does not entitle him to have a lawyer present. See also Moore v. Illinois, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977), wherein Wade was applied to a rape victim's identification of the defendant at a preliminary hearing when no counsel was present. The Court ruled that the "adversary judicial criminal proceedings" had begun, requiring the exclusion of the out-of-court identification.
[6] Compare exclusion of testimony of pretrial identification in this case, because Gilbert had no attorney, with Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), infra, in which, upon a clear cut violation of a due process right, the per se exclusionary rule was not applied.
[7] California permits introduction into evidence of conviction of a similar crime in proving the case in chief.

In California no conviction can be based solely upon the testimony of an accomplice.
[8] The opinion states the following:

The reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury. But it is the teaching of Wade, Gilbert, and Stovall, supra, that in some cases the procedures leading to an eyewitness identification may be so defective as to make the identification constitutionally inadmissible as a matter of law.
394 U.S. at 442, n. 2, 89 S.Ct. at 1128, n. 2.
[9] If the Court had been consistent with its holding in Gilbert, all testimony pertaining to the out-of-court identification would have been excluded, while the in-court identification would be competent only upon clear and convincing proof that it was not a result of the out-of-court identification. The opinion makes no note of this problem, however. Justice Black's dissent forcefully called aspects of this question to the Court's attention. 388 U.S. at 277, 87 S.Ct. at 1963. Incidentally, Justice Black never agreed that any pretrial identification procedure violated a due process right. He consistently argued such matters were for the jury to weigh. His dissents are forceful and lucid, and his, as well as other justices' dissents and concurring opinions give full view to the problems of identification testimony which the Supreme Court grappled with. We cannot set them all out, however.
[10] Clearly the Court intended these factors to be weighed when testimony was proffered as to the suggestive pretrial identification. Not clear is the necessity of considering them upon an in-court identification following a suggestive pretrial identification procedure. In any event, this Court has consistently adhered to the Biggers factors on all in-court identifications.
[11] Chambers v. State, 402 So.2d 344 (Miss. 1981); Miller v. State, 399 So.2d 1338 (Miss. 1981); Bankston v. State, 391 So.2d 1005 (Miss. 1980); Kimbrough v. State, 379 So.2d 934 (Miss. 1980); Stewart v. State, 377 So.2d 1067 (Miss. 1979); Johnson v. State, 359 So.2d 1371 (Miss. 1979); Scott v. State, 359 So.2d 1355 (Miss. 1978); Clubb v. State, 350 So.2d 693 (Miss. 1977); Wilson v. State, 344 So.2d 739 (Miss. 1977); Fells v. State, 345 So.2d 618 (Miss. 1977); Gentry v. State, 338 So.2d 1229 (Miss. 1976); Oliver v. State, 285 So.2d 897 (Miss. 1973); Allen v. State, 274 So.2d 136 (Miss. 1973); Evans v. State, 273 So.2d 495 (Miss. 1973); Auman v. State, 271 So.2d 427 (Miss. 1973); Simes v. State, 250 So.2d 705 (Miss. 1971); Baylor v. State, 246 So.2d 516 (Miss. 1971); Dorsey v. State, 243 So.2d 550 (Miss. 1971); Sanders v. State, 219 So.2d 913 (Miss. 1969); Butler v. State, 217 So.2d 3 (Miss. 1968); Poole v. State, 216 So.2d 425 (Miss. 1968).
[12] Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).
[13] Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).
[14] Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).